**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

**Civil Action No. 16-cv-01324-MSK-NYW**

**GREG A. CLARKSON,**

**Plaintiff,**

**v.**

**UNIVERSITY OF DENVER,**

**Defendant.**

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to the Defendant's Motion for Summary Judgment **(#47)**, the Plaintiff's Response **(#52)**, and the Defendant's Reply **(#59)**.

## JURISDICTION

The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## FACTS

The Court offers a brief summary of the facts here and elaborates as necessary in its analysis. All evidence is construed most favorably to Mr. Clarkson.

Mr. Clarkson is 61 years-old and has worked for the Defendant University of Denver ("DU") for more than thirty years, most recently as a Telecommunication Analyst in DU's Technology and Telecommunications Department ("the Department"). Mr. Clarkson has an Associate's Degree in computer science and Bachelor of Arts degree in applied computers with an emphasis in computer science, math, and philosophy, and although he does not hold one, he has earned enough additional college credits for a Master's Degree.

DU made Chad Burnham Mr. Clarkson's direct supervisor in 2013. After he became Mr. Clarkson's supervisor, Mr. Burnham questioned Mr. Clarkson's age and wanted to know when he was going to retire. Mr. Burnham also created new engineering positions that are classified higher than analyst positions and are higher paying. Without posting the positions or giving others an opportunity to apply, Mr. Burnham promoted two employees who were younger than Mr. Clarkson to fill the engineer positions: 40-year old Marcelo Lew, and 49-year old Mike Mott. Later, Mr. Burnham altered a job description to promote James Conyers, 33 years old, to the position of engineer as well. Even though Mr. Clarkson has more education and experience than Mr. Lew, Mr. Mott, and Mr. Conyers, Mr. Burnham did not consider Mr. Clarkson for promotion to engineer. Other younger employees also received promotions: 41-year old John Roberts was promoted to telecommunications infrastructure coordinator. Later, Mr. Burnham also altered a job description to hire a recent college graduate, 22-year old Ken Harris, as an Analyst like Mr. Clarkson, even though Mr. Harris did not have the necessary experience.

Although he has not been disciplined or placed on a performance improvement plan and has regularly received merit wage increases, Mr. Clarkson did not receive a promotion, is now subordinate to the engineers, and is paid substantially less than each of them. Additionally, even though Mr. Clarkson is a skilled troubleshooter, Mr. Burnham has removed most of Mr. Clarkson's troubleshooting duties and given them to the engineers.

Additionally, from time to time, Mr. Clarkson sought permission from Mr. Burnham to attend sessions and seminars to receive additional training to develop professionally and keep up with new technologies and advances. Mr. Burnham denied his requests. For example, DU was implementing a new system, and Mr. Clarkson needed training on that system to be able to

perform his job. Mr. Burnham allowed lower level analysts and engineers to attend the training but not Mr. Clarkson.

In August 2014, Mr. Clarkson raised concerns with Kathryne Grove, DU's Office of Equal Opportunity Director, that he was being discriminated against because of his age. Ms. Grove assigned Molly Rossi to investigate Mr. Clarkson's claims. Ms. Rossi conducted an investigation, reviewed documentation, and interviewed Mr. Clarkson, Mr. Burnham, and Cindy Crouch, a DU vice chancellor to whom Mr. Burnham report. Ms. Rossi found that Mr. Clarkson had not been discriminated against on the basis of his age.

After he raised his concerns to Ms. Grove, Mr. Clarkson noted that Mr. Burnham and his coworkers began treating him differently. Mr. Burnham spoke with him about another employee, Bill Campbell, whose employment with DU had been terminated after Mr. Campbell had filed a charge of discrimination with the EEOC. Mr. Clarkson's coworkers would stop talking to him if he walked up to a group of them. Although he had usually taken time off in the beginning of January each year, Mr. Burnham denied his request to take time off in January 2015. Mr. Burnham also told Ms. Rossi during the investigation that Mr. Clarkson was having performance issues, even though Mr. Clarkson had historically received positive performance reviews and had not been disciplined.

Finally, during his time at DU, Mr. Clarkson has also suffered from several disabilities. These include major depressive disorder, which was aggravated when his mother passed away, dyslexia, and a back injury. Mr. Burnham learned of Mr. Clarkson's depression in December 2014, his dyslexia no later than May 2015, and his back injury shortly after Mr. Clarkson sustained it in January 2015. On occasion, Mr. Burnham ridiculed Mr. Clarkson for his spelling errors in front of other employees. Further, after learning of Mr. Clarkson's depression, Mr.

Burnham's supervisor instructed Mr. Burnham to begin documenting Mr. Clarkson's "odd" behavior.

Based on these facts, Mr. Clarkson commenced this action. In his Complaint **(#1)**, Mr. Clarkson asserts four claims: (1) a claim for age discrimination under the Age Discrimination in Employment Act ("ADEA") (2) a claim for disability discrimination (apparently under both a disparate treatment and a failure to accommodate theory) in violation of the Americans with Disabilities Act ("ADA"), (3) a claim for retaliation in violation of the ADEA and/or the ADA, and (4) a claim he titles "Title VII – Inadequate Investigation by Defendant." DU moves for summary judgment **(#47)** on all of Mr. Clarkson's claims.

## ANALYSIS

### A. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Thus, the primary question presented to the Court in considering a Motion for Summary Judgment or a Motion for Partial Summary Judgment is: is a trial required?

A trial is required if there are material factual disputes to resolve. As a result, entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). A fact is material if, under the substantive law, it is an essential element of the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the conflicting evidence would enable a rational factfinder to resolve the dispute for either party. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

The consideration of a summary judgment motion requires the Court to focus on the

asserted claims and defenses, their legal elements, and which party has the burden of proof. Substantive law specifies the elements that must be proven for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson*, 477 U.S. at 248; *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). As to the evidence offered during summary judgment, the Court views it the light most favorable to the non-moving party, thereby favoring the right to trial. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

Motions for summary judgment generally arise in one of two contexts—when the movant has the burden of proof and when the non-movant has the burden of proof. Each context is handled differently. When the movant has the burden of proof, the movant must come forward with sufficient, competent evidence to establish each element of its claim or defense. *See* Fed. R. Civ. P. 56(c)(1)(A). Presumably, in the absence of contrary evidence, this showing would entitle the movant to judgment as a matter of law. However, if the responding party presents contrary evidence to establish a genuine dispute as to any material fact, a trial is required and the motion must be denied. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

A different circumstance arises when the movant does not have the burden of proof. In this circumstance, the movant contends that the non-movant lacks sufficient evidence to establish a *prima facie* case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party must identify why the respondent cannot make a *prima facie* showing; that is, why the evidence in the record shows that the respondent cannot establish a particular element. *See Collins*, 809 F.3d at 1137. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, then a trial is required. Conversely, if the respondent's evidence is

inadequate to establish a *prima facie* claim or defense, then no factual determination of that claim or defense is required and summary judgment may enter. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

**B. Burden Shifting Analysis**

Mr. Clarkson's ADEA and ADA discrimination claims must be examined under the well-established, burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Mr. Clarkson bears the initial burden of establishing a *prima facie* case[1] for each claim. If Mr. Clarkson carries his burden, DU then has the burden to articulate a legitimate, non-discriminatory reason for its actions. If DU carries its burden, then Mr. Clarkson bears the ultimate burden of demonstrating that DU's proffered reason is pretext. *See Daniels v. United Parcel Serv.*, 701 F.3d 620, 637-39 (10th Cir. 2012); *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1279-80 (10th Cir. 2010); *E.E.O.C. v. P.V.N.F., LLC*, 487 F.3d 790, 800 (10th Cir. 2007); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178-79 (10th Cir. 1999).

To show pretext, a plaintiff must offer evidence demonstrating both that the reason proffered by the employer is not true, and that the true reason for the adverse action was discrimination or retaliation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000). It is not sufficient to present evidence that merely tends to discredit the employer. *See id.* To show that a proffered reason is untrue, a plaintiff may present evidence that reveals weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that would lead a reasonable factfinder to find the proffered reason is untrue. *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005). A plaintiff might offer evidence that the employer's reason was post-hoc, or otherwise insincere, but

[1]The burden on an employee at the *prima facie* stage is "not onerous," *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000), and has even been described as "*de minimis*." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).

evidence that an employer merely made a subjective mistake in perceiving the facts is not sufficient to show pretext. The Court does not analyze whether an employer's actions were wise, fair, or even factually correct; rather, it looks only at whether the employer "honestly believed its reasons and acted in good faith." *See Bennett v. Windstream Comm'ns., Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015).

**C. Mr. Clarkson's claim under the ADEA**

**1. *Prima Facie* Case**

To establish a *prima facie* case of age discrimination, Mr. Clarkson must demonstrate that: (1) he is a member of the class protected by the ADEA – that is, that he is over 40 years of age; (2) he suffered an adverse employment action; (3) he was qualified for the position he sought; and (4) the adverse action was taken against him under circumstances giving rise to an inference of age-based discrimination. *See Jones*, 617 F.3d at 1279-80. DU does not challenge whether Mr. Clarkson is a member of a protected class. Instead, it argues that Mr. Clarkson did not suffer an adverse employment action, that he was not qualified for a promotion, and that he was not treated less favorably than others outside his protected class.

**a. Adverse Employment Action**

In the Tenth Circuit, an adverse employment action is defined by example: it includes "significant change[s] in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"; it does not include "a mere inconvenience or alteration of job responsibilities." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir.2007); *see also MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1279 (10th Cir.2005) ("while adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee

unhappy is an actionable adverse action"). Mr. Clarkson argues that removing some of his responsibilities, excluding him from trainings and meetings, and failing to promote him to an engineering position all constitute adverse employment actions.

**(i) Reduction in Responsibilities**

Mr. Clarkson alleges that Mr. Burnham has been systematically removing or reassigning job duties away from Mr. Clarkson's position. It is undisputed that, at the time Mr. Burnham was hired, the Department was undergoing a significant change in its focus, including a decision by Ms. Crouch to move from DU hosting its own physical data servers to migrating its data to virtual (*i.e.* cloud-based) servers, thereby eliminating the need to maintain and troubleshoot hardware. Noting that, at one point, his job description stated that he was required to "participate in the selection, installation, operation, monitoring, troubleshooting, and maintenance of network hardware, software monitoring tools, and wiring infrastructure (copper and fiber); interaction with users in the service oriented environment," Mr. Clarkson testified that the only part of those duties that remain is the use of software monitoring tools. Where his job description once called for him to perform "CAT 5/6 tester, wire map, OTDR, [and] cable locator" tasks, he "ha[s] not been doing any of this testing whatsoever" and does only a "minimal amount of network troubleshooting and testing."[2] In his deposition, Mr. Clarkson gave the example that although both hardware and software troubleshooting were formerly part of his job duties, the hardware troubleshooting tasks were taken away, leaving him only with software troubleshooting to perform (Mr. Clarkson considers the latter more tedious than the former). He testified that his

---

[2] Mr. Clarkson concedes that cable locating duties were transferred away from his job as an accommodation of his disability relating to his back injury. The Court does not understand him to complain about the reassignment of that duty. Mr. Clarkson's testimony seems to suggest that he would have welcomed being assigned a comparable replacement task, but none was forthcoming.

workload now only occupies a few hours of his time each day, instead of occupying the full 40 hours a week it previously had. At the same time, it is undisputed that neither Mr. Clarkson's salary nor his hours have been reduced as a result of the reassigned duties. Mr. Clarkson testified during his deposition that, because of the reduction in his responsibilities, he no longer feels valued as an employee. He also testified that he feels it is unethical to continue receiving his full salary for performing less work and wants to be reassigned his prior responsibilities.

To be a sufficiently adverse employment action, a reassignment of duties must be "significant," viewed from the perspective of a reasonable person in the plaintiff's position. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012). The plaintiff's subjective opinions as to which tasks are desirable and which are not does not factor into the analysis, although a showing that a given task is <u>objectively</u> considered more desirable may be pertinent. *Id.*; *Piercy*, 480 F.3d at 1203-04. In *Nettle v. Central Okla. American Indian Health Council, Inc.*, 334 Fed.Appx. 914, 926-27 (10th Cir. 2009), the 10th Circuit found that the reassigning an employee away from running annual fund drives – a task the employee had initiated and particularly enjoyed – did not amount to an adverse employment action because the employee's job assignments were inherently mutable and the removed tasks did not alter the fundamental nature of her job.

Here, the question of whether Mr. Clarkson has adequately shown that reassignment of his job duties amounts to an adverse employment action is a close one. The fact that Mr. Clarkson's duties have shrunk to occupying only a few hours each day suggests that the reduction in tasks is indeed significant, although the change has had no effect on Mr. Clarkson's work hours or pay. Mr. Clarkson has only identified his own subjective assessment that the remaining tasks are less-desirable than those that were taken away. It certainly appears that, at

least in terms of descriptive verbiage, Mr. Clarkson has substantially fewer tasks than he used to, but there is little in the record to qualitatively assess which of the missing tasks were fundamental to the Analyst position and which were incidental. Mr. Clarkson described the crux of his job as performing "hardware analytical troubleshooting" and "software analysis," and that only the later remains. Ultimately, the Court concludes that, because the issue arises at the *prima facie* stage – where Mr. Clarkson's burden is at its lightest – it is appropriate to conclude that Mr. Clarkson has at least raised a genuine issue for trial as to whether the reassigned duties are sufficient to constitute an adverse action. The Court's task at this stage of the analysis is not to decide whether DU took the tasks away from Mr. Clarkson for a good reason or bad reason; the Court's inquiry here is only whether significant duties were taken away. Taking the evidence in the light most favorable to Mr. Clarkson, as the Court must here, it finds that a jury could conclude that the reassignment of Mr. Clarkson's job tasks was a sufficiently adverse action; whether the jury here will actually reach that conclusion is a different question and one which the Court need not consider. Accordingly, the Court finds that Mr. Clarkson has adequately shown a triable question as to whether the reassignment of his duties was an adverse employment action.

**(ii) Excluding from Meetings and Trainings**

Mr. Clarkson next argues that excluding him from meetings and trainings constitutes adverse employment action. He presented evidence that Cisco provided the Department with a monthly educational and training meeting related to the implementation of a new telecommunications system at DU. Mr. Burnham removed Mr. Clarkson from the meeting notification email list for these meetings and did not allow him to attend, resulting in Mr. Clarkson not receiving training to work on the new system. Mr. Clarkson was also not allowed to

attend seminars or events providing educational information about new technologies. On another occasion, Mr. Clarkson asked to receive training necessary to become the VoIP call manager in the Department. Mr. Burnham denied Mr. Clarkson's request and instead gave James Conyers the necessary training. Mr. Conyers was later given a promotion based, at least in part, on the training he received and served as the VoIP call manager.

The denial of training opportunities can amount to an adverse employment action where the training is materially related to the employee's job responsibilities or possibilities for advancement. *Gooden v. Internal Revenue Serv.*, 679 Fed.Appx. 958, 965 (11th Cir. 2017). There is some indication that Mr. Clarkson needed additional training to receive promotions within the Department, as illustrated by Mr. Conyer's promotion. By denying him such training, DU arguably precluded his ability to be promoted. Thus, there is a genuine issue as to whether denying him training under these circumstances constitutes an adverse employment action.

**(iii) Failing to Promote**

As to the failure to promote, DU argues that Mr. Clarkson was not interested in, did not apply for, and/or admits that he was not qualified for the promotions Mr. Burnham gave to others. These arguments are not factually accurate.

To support its assertion that Mr. Burnham was not interested in the positions given to others, DU notes that Mr. Clarkson testified during his deposition that he was not interested in a position given to Kenneth Harris and a position given to Alex Khramov. Mr. Harris was hired as a Telecommunications Analyst I. Mr. Khramov was hired as an Assistant Director in the Department. However, in Mr. Clarkson's response, his evidence and argument supporting his failure to promote claim focus on the failure to promote him to the position of Engineer, a

position not held by either Mr. Harris or Mr. Khramov. The record is devoid of any admission by Mr. Clarkson that he was not interested in an engineering position.

As to DU's argument that Mr. Clarkson did not apply for any engineering position, Mr. Clarkson produced evidence that DU, through Mr. Burnham, created new engineering positions within the Department. Mr. Burnham hand-selected individuals to fill those positions and did not give anyone else the opportunity to apply for them. Thus, it was impossible for Mr. Clarkson to apply for an engineering position.

Further, the evidence does not support DU's assertion that Mr. Clarkson admitted that he was not qualified for an engineering position. During his deposition, Mr. Clarkson testified that he needed additional training for two positions: Mr. Khramov's position and the position held by Mr. Conyers. Again, Mr. Khramov was not an engineer. Mr. Clarkson did testify that he needed additional training to perform Mr. Conyers' position, but as discussed, he asked for such training. Mr. Burnham denied his request and chose to train Mr. Conyers instead. This evidence shows that Mr. Clarkson would have been qualified for Mr. Conyers position had he been given the same training opportunity. Thus, construing the evidence most favorably to Mr. Clarkson, he did not admit that he was not qualified.

As to his *prima facie* burden to show adverse employment action, Mr. Clarkson produced evidence showing that DU, through Mr. Burnham, created engineering positions within the Department. Mr. Burnham did not open the positions up for applications or consider Mr. Clarkson for them. Instead, he promoted individuals who were younger than and had less experience and seniority in the Department than Mr. Clarkson. Now, Mr. Clarkson is subordinate to these individuals and makes less money than them. Thus, Mr. Clarkson has produced

sufficient evidence to show that DU failed to promote him, which is sufficient to show that Mr. Clarkson suffered an adverse employment action.

**b. Mr. Clarkson's Qualifications**

The next inquiry is whether Mr. Clarkson has produced sufficient evidence to show that he was qualified for a promotion to work as an Engineer. DU argues that Mr. Clarkson was not as qualified as those who received the engineering positions. Arguments as to the relative qualifications between candidates are not germane to the *prima facie* case; the consideration at this early stage is whether Mr. Clarkson met the minimum, objectively-ascertainable and patently job-related requirements for the position he sought. *See E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000). The question of his qualifications relative to the successful candidate is more appropriately addressed at the pretext stage of the *McDonnell Douglas* analysis.

DU produced a description outlining the requirements for an Engineer position in the Department. The description lists multiple mandatory qualifications. These include knowledge of various technology systems, types of hardware, and software programs, a Bachelor's Degree in computer science or electrical engineering, or equivalent experience, and at least four years of education or experience related to installing, operating, and troubleshooting telecommunications systems. Mr. Clarkson produced evidence that he has worked in technology and telecommunications for approximately thirty years. He has an Associate's Degree and a Bachelor's Degree in computer science and applied computers. He has taken enough additional college courses pertaining to computers and technology to obtain a Master's Degree. He also has experience installing, operating, and maintaining telecommunications systems and has become especially skilled in troubleshooting problems when they arise. This evidence is sufficient to

make a *prima facie* showing that Mr. Clarkson had the minimum objective qualifications to perform the Engineer position, and thus, Mr. Clarkson has carried his burden on this element of the *prima facie* case.

**c. Circumstances Giving Rise to an Inference of Age-based Discrimination**

DU argues that Mr. Clarkson was not treated differently than anyone similarly-situated. Mr. Clarkson argues that individuals younger than he with less experience were given training he did not receive and were promoted over him, giving rise to the inference that DU, through Mr. Burnham, discriminated against him on the basis of his age.

The "circumstances giving rise to an inference" element of the *prima facie* case can be satisfied in a number of ways, including pointing to preferential treatment given to those outside the protected class, comments made by decisionmakers that suggest a discriminatory animus, or simply the suspicious timing and sequence of events. *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012). Here, several facts suffice to carry Mr. Clarkson's burden. When Mr. Burnham became Mr. Clarkson's supervisor, he questioned Mr. Clarkson's age and asked when he was going to retire, a comment that could be understood to suggest discriminatory bias on Mr. Burnham's part. Later, Mr. Burnham hand-selected individuals younger than Mr. Clarkson to receive promotions as engineers. He neither considered Mr. Clarkson for promotion nor gave him an opportunity to apply for one. Mr. Burnham also favored younger employees and promoted them to various positions, even when they were not qualified. All of these actions suggest that more favorable consideration was given to similarly-situated individuals who were significantly younger than Mr. Clarkson, another example of evidence of potential discrimination.

The circumstances surrounding Mr. Conyers' promotion are especially significant. Mr. Conyers was approximately 33 years old at the time of his promotion. As discussed, before he was promoted, Mr. Burnham selected him over Mr. Clarkson to receive training to serve as the VoIP call manager, and he received his promotion, at least in part, because of this training. A reasonable jury could infer that Mr. Burnham's decision to train and promote Mr. Conyers over Mr. Clarkson was age-based.

Therefore, Mr. Clarkson has presented sufficient evidence to make a *prima facie* showing that he was denied training and promotions because of his age.

**2. Pretext**

As stated above, DU argues that it did not promote Mr. Clarkson to the position of engineer because the individuals who were promoted to engineer were more qualified than him. It also argues that it excluded Mr. Clarkson from meetings and trainings because they were not related to his job duties or were nothing more than sales pitches.

**a. Mr. Clarkson's Qualifications Compared to Those of the Individuals Who Were Promoted to Engineering Positions**

The prohibition against age discrimination does not suffice as an invitation to courts to second-guess hiring decisions, particularly subjective evaluations by an employer of the relative qualifications of two candidates who otherwise satisfy all of the job description's objective requirements. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1198-1200 (10th Cir. 2008). Even unwise or unfair hiring decisions by employers do not give rise to liability, unless the plaintiff can show that the employer did not even honestly believe the reasons it gave for selecting the successful candidate. *See Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010). Thus, to show that DU's claim that those promoted to engineering positions were more qualified than Mr. Clarkson is pretext for discrimination, Mr. Clarkson must produce evidence to

show "an 'overwhelming' disparity in qualifications" between himself and those promoted, such that no reasonable decision maker could have viewed those promoted as being better qualified. *Id.*

This standard imposes a substantial burden on Mr. Clarkson. However, neither DU nor Mr. Clarkson address it in their briefing. This is likely because DU raised its arguments as to Mr. Clarkson's qualifications within the context of Mr. Clarkson's *prima facie* case, which is governed by a less stringent burden. In light of this, the Court is not confident that Mr. Clarkson had sufficient notice of his burden within the context of showing pretext. Absent such notice, the Court finds that granting summary judgment against him would not be proper. Thus, the issue of his qualifications compared to the qualifications of others must be addressed at trial.[3]

**b. Whether Meetings and Trainings Were Related to Mr. Clarkson's Responsibilities or Were Nothing More than Sales Pitches**

Mr. Clarkson has not produced any evidence that the meetings and trainings which Mr. Burnham prohibited him from attending were related to his job responsibilities or were something other than sales pitches. When addressing whether DU's proffered reasons were pretext, Mr. Clarkson cites to no evidence and simply states that he should not have been removed from the email list notifying of meetings and that others were allowed to attend training. Further, the Court has reviewed the evidence he submitted and can find no contrary evidence, with one exception.

The exception pertains to the training that Mr. Conyers received and that Mr. Clarkson also asked to receive concerning VoIP call management. Both Mr. Conyers and Mr. Clarkson needed that training to qualify for a promotion, and after Mr. Conyers received it, he was

---

[3] Even if the Court were to assess this argument on its merits, it would find that, in light of Mr. Clarkson's considerable education and years of experience, there is at least a genuine dispute of fact as to whether he is substantially more qualified than the individuals selected for the Engineer positions.

promoted to an engineering position superior to Mr. Clarkson. This evidence is inconsistent with DU's justification for preventing Mr. Clarkson from attending trainings. Thus, as to this training, there is sufficient evidence to show DU's proffered reason for not allowing Mr. Clarkson to receive it is pretextual, and this issue must also be addressed at trial.

**D. ADA Violation**

To establish a *prima facie* claim for discriminatory termination under the ADA, Mr. Clarkson must come forward with sufficient evidence to show (1) that he is a disabled person within the meaning of the ADA, (2) that he is qualified, that is, he is able to perform the essential functions of the job, with or without reasonable accommodation, (3) that he experienced an adverse employment action, and (4) that adverse action was taken against him under circumstances giving rise to an inference of disability-based discrimination. *See E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037-38 (10th Cir. 2011); *E.E.O.C. v. P.V.N.F., LLC*, 487 F.3d 790, 800 (10th Cir. 2007).

As to this claim, DU does not dispute that Mr. Clarkson's depression, dyslexia, and back injury rendered him disabled within the meaning of the ADA, that he is qualified, or that he suffered one of several potential adverse employment actions. Rather, it argues that there is no evidence that DU took adverse employment actions against him because of his disabilities. In response, Mr. Clarkson argues that DU could have removed some of his responsibilities, failed to promote him, and excluded him from trainings and meetings because of his disabilities instead of his age. He also argues that he suffered an additional adverse employment action because of his dyslexia when Mr. Burnham ridiculed him for his spelling.

As previously discussed, the readjustment of Mr. Clarkson's job duties, the exclusion of Mr. Clarkson from some training programs, and the proposition of others to Engineer positions, all during 2013-2014, could arguably be adverse employment actions. However, Mr. Burnham

criticizing Mr. Clarkson's spelling does not constitute an adverse employment action, absent a showing that Mr. Clarkson was disciplined or demoted as a result, and no evidence suggests as much. The same is true of Mr. Clarkson's contentions that, after he complained to DU, Mr. Burnham began documenting Mr. Clarkson's performance and "odd behavior" at the direction of Mr. Burnham's supervisor. Increased monitoring of an employee, absent a showing of further adverse actions flowing therefrom, does not generally constitute an adverse action in and of itself. *Tapia v. City of Albuquerque*, 170 Fed.Appx. 529, 534 (10th Cir. 2006).

Mr. Clarkson's ADA discrimination claim fails because all of the adverse actions he could demonstrate occurred long before Mr. Clarkson alleges that anyone at DU was aware of his disabilities. The record reflects that DU learned of Mr. Clarkson's depression in December 2014, of his dyslexia in or about May 2015, and his back injury in January 2015. However, all of the alleged adverse actions in this case occurred before August 2014. As a general rule, an employer's lack of knowledge of an individual's disability precludes the employee from later showing that adverse actions took place under circumstances giving rise to an inference of discrimination.[4] *See Ewing v. Doubletree DTWC, LLC*, 673 Fed.Appx. 808, 812-13 (10th Cir. 2016).

Mr. Clarkson also argues that, once DU was aware of his disabilities, it violated the ADA by failing to accommodate those disabilities. This argument is somewhat ill-focused: the

---

[4] It is also possible for an employer to discriminate on the basis of disability by making adverse decisions about an employee based on the <u>symptoms</u> of the employee's disability, even if the employer is unaware of the existence of the disability itself. However, such circumstances are generally limited to those where the symptoms are "so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability." *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 934 (7th Cir. 1995). Mr. Clarkson's stated symptoms – increased stress, a lack of enjoyment in his work, illegible handwriting – are not so obviously and exclusively correlated with disabilities that once could infer DU's knowledge of Mr. Clarkson's condition.

accommodations Mr. Clarkson suggests that DU should have made are, frequently, mirror images of the adverse actions that underlie his discrimination claims: to alleviate the stress from Mr. Clarkson's depression, he alleges that DU could have accommodated him by "[not] remov[ing] Plaintiff['s job duties, exclud[ing] him from meetings, [or] pass[ing] him over for promotional opportunities"; he suggests that his dyslexia could have been accommodated by "providing [him] with a number of tasks rather than taking them away" (as dyslexics "are actually better at juggling tasks rather than concentrating on one thing"). Mr. Clarkson does not assert that he specifically requested any particular accommodation from DU; he simply asserts that, upon learning of his disabilities, DU should have unilaterally taken action to accommodate them. That is not what the ADA requires. The employee must ordinarily initiate the accommodation process by giving notice of the disability to the employer, describing any limitations that result from it, and express a desire for an accommodation for aspects of the job that touch on those limitations. *Hall v. Claussen*, 6 Fed.Appx. 655, 666 (10th Cir. 2001). Thereafter, the parties enter into an "interactive process" focused on locating a mutually-agreeable accommodation. Mr. Clarkson admits in his deposition that he never actually requested any accommodation from DU. Because Mr. Clarkson admittedly did not discharge his initial burden to initiate the accommodations process, DU is entitled to summary judgment on his failure to accommodate claim.

**E. Retaliation**

To establish a *prima facie* case of retaliation, Mr. Clarkson must demonstrate that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *Daniels v. United Parcel Serv.*, 701 F.3d 620, 637-39 (10th Cir. 2012); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178-79 (10th Cir. 1999). DU does not challenge whether Mr. Clarkson engaged in

protected activity in August 2014. It argues instead that Mr. Clarkson did not suffer an adverse employment action after that date and that if he did, there is no causal connection between the protected activity and the adverse action.

As noted above, adverse employment actions include decisions resulting in significant changes in employment status and significant changes in benefits. Indeed, in the retaliation context, the definition of an adverse action is even broader than in the ordinary disparate treatment context. *Burlington Northern & Santa Fe RR Co. v. White*, 548 U.S. 53, 68 (2006). An action is "adverse" for retaliation purposes if it might have dissuaded a reasonable worker from making or supporting a charge of discrimination. However, "trivial harms," "petty slights," and "minor annoyances that often take place at work and that all employees experience," on the other hand, do not suffice, as antidiscrimination laws do "not set forth a general civility code for the American workplace." *Id.*

Even under that more relaxed standard, Mr. Clarkson has not identified any post-August 2014 employment actions that rise to that level. He alleges that, after he complained to DU that Mr. Burnham was discriminating against him: (i) Mr. Burnham talked to Mr. Clarkson about another employee who had been fired after filing a complaint with the EEOC; (ii) Mr. Burnham declined Mr. Clarkson's request to take time off in January 2015; and (iii) Mr. Clarkson's coworkers would not talk to him as they had before his complaint. These actions are the very sort of "trivial harms" that fall outside of ADEA protection. *Id.* (antipathy and snubbing by supervisors and co-workers does not suffice). Accordingly, DU is entitled to summary judgment on Mr. Clarkson's retaliation claims.

**F. Inadequate Investigation**

DU argues that Mr. Clarkson's claim for "Inadequate Investigation" is not a valid cause of action. Citing to the Tenth Circuit's ruling in *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d

530, 543 (10th Cir. 2014), Mr. Clarkson argues that there is an independent cause of action under Title VII for conducting an inadequate investigation into an employee's claim that he or she has been subjected to discrimination.

A brief review of *Smothers* shows that there is no independent cause of action under Title VII for conducting an inadequate investigation. In *Smothers*, the plaintiff was a longtime employee who suffered an on-the-job injury, requiring him to take intermittent leave under the FMLA for treatment and recovery. This work schedule posed difficulties for his co-workers and supervisors, leading to negative performance reviews and denied promotions due to his "absenteeism." Sometime later, the plaintiff was involved in an incident in which he made a repair to a machine, ostensibly in violation of the employer's "lock-out" policies for working on damaged equipment. This incident led to an argument with a co-worker, and that co-worker complained to management about the incident. The employer sent the plaintiff home pending investigation, and took several statements from the co-worker about the incident, but never interviewed the plaintiff. Eventually, the employer decided to terminate the plaintiff for his role in the argument. The plaintiff then brought claims against the employer, including one for discrimination in violation of the FMLA.

The trial court granted the employer's summary judgment motion on the FMLA discrimination claim. That claim was analyzed according to the same burden-shifting paradigm described herein. The trial court found that the plaintiff had established a *prima facie* claim of discrimination and that the employer had carried its burden of articulating a legitimate reason for the termination. Moving on to the question of pretext, the trial court found that the plaintiff could not establish that the employer's proffered reason was pretextual. On appeal, neither side challenged the trial court's findings at the *prima facie* case stage. However, the Tenth Circuit

reversed the trial court's findings that the plaintiff could not demonstrate pretext. It found that the employee had established a genuine dispute of fact as to whether the employer treated the plaintiff more harshly than similarly-situated employees who committed similar violations.

The Tenth Circuit also found that the employer's "failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted" the termination could be evidence of pretext. It explained that the employer solicited the co-worker's version of events multiple times during its investigation, but never spoke to the plaintiff or allowed him to present his own side of the story or respond to the co-worker's allegations. By doing so, the Tenth Circuit found that the employer "ultimately relied on one-sided information and accepted [the co-worker's] allegations and negative characterizations of Mr. Smothers' behavior." The Tenth Circuit concluded that the "decision makers deliberately prevented Mr. Smothers from defending his actions with respect to the quarrel and consequently reached their conclusions about what transpired based on one-sided information – then fired Mr. Smothers based largely on those tenuous conclusions." *Id.* at 543. Thus, unsurprisingly, it held that a reasonable jury could consider an inadequate or unfair investigation coupled with the company's differential treatment of similarly-situated employees as evidence that the employer's reasons for the termination were pretextual. *Id*.

There is nothing in *Smothers* to indicate that a freestanding claim for conducting an inadequate investigation is cognizable under Title VII. The Tenth Circuit discussed such investigations entirely within the context of whether the plaintiff could show his former employer's reasons for terminating him were pretextual. Therefore, Mr. Clarkson's claim for "Inadequate Investigation" must be dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment **(#47)** is **GRANTED IN PART** and **DENIED IN PART**. It is granted insofar as the DU is entitled to summary judgment on Mr. Clarkson's ADA claim, retaliation claim, and inadequate investigation claim. It is denied in all other respects.

The parties shall begin preparation of a Proposed Pretrial Order consistent with the instructions in the Trial Preparation Order **(#17)** and shall jointly contact the Court within fourteen days to schedule a Pretrial Conference on Mr. Clarkson's ADEA claim.

Dated this 19th day of March, 2018

**BY THE COURT:**

Marcia S. Krieger

Marcia S. Krieger
Chief United States District Judge